IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 13-cr-30059 |
| ) | |
| PAVEL LEIVA, ) | |
| ) | |
| Defendant. ) | |

### REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

This matter comes before the Court for a Report and Recommendation on Defendant Pavel Leiva's Motion to Suppress Evidence (d/e 21). On November 6, 2013, the Court held an evidentiary hearing on the Motion. The Government appeared by Assistant United States Attorney Gregory Harris. The Defendant appeared in person and by his attorneys Assistant Federal Public Defenders Karl Bryning and Daniel Hansmeier. After careful consideration of the submissions of the parties, the evidence adduced at the hearing, the arguments of counsel, and the applicable law, the Court recommends that the Motion should be DENIED.

## STATEMENT OF FACTS[1]

The Government presented the testimony of Illinois State Police Troopers Dustin Weiss, Clayton Chapman, and Kevin Marrie; Illinois State Police Special Agent John Yard; United States Secret Service Agent Vincent Pescitelli; Illinois State Police Lieutenant Felix Canizares; and Leiva's co-defendants Amber Michele Martin and Paola Gallego. Their testimony showed the following.

On June 26, 2013, Trooper Weiss was patrolling Interstate-55 (I-55) near Sherman, Illinois. Weiss observed a Hyundai Elantra (Hyundai) heading south. The driver changed lanes as he passed and slowed down. Trooper Weiss followed along behind the Hyundai. Trooper Weiss observed the Hyundai swerve onto the shoulder, or emergency lane, and then pull back onto the main roadway. Trooper Weiss turned on his emergency lights and pulled the vehicle over.

Trooper Weiss ran the license plate of the Hyundai and learned it was a rental. Trooper Weiss exited his vehicle and walked up to the passenger side of the Hyundai to speak to the driver. Leiva was driving. Co-defendant Gallego was in the front passenger seat and co-defendant Martin was in the rear passenger seat. Trooper Weiss spoke to Leiva in

---

[1] This Report and Recommendation has been prepared without the benefit of a transcript of the hearing.

English and told him the reason for the stop.  Leiva handed Weiss the rental agreement for the Hyundai.  Leiva, however, did not speak English.  Leiva was from Cuba and spoke Spanish.  Gallego spoke both English and Spanish and translated for Weiss while he was at the passenger window.

Weiss went back to his vehicle and ran a computer check.  Weiss then asked Leiva to come back to his vehicle.  Leiva appeared nervous.  Weiss could see the artery in Leiva's neck pulsate.  Weiss gave Leiva a warning and gave him back his rental agreement and other documentation.  Leiva signed the warning.  Weiss used an English-to-Spanish translating app on his smart phone to tell Leiva that he was free to go in Spanish.

Leiva started to leave when Weiss asked Leiva a question in Spanish, "Pueda buscar su coche?"  Weiss read the question from a sheet with several English phrases and the Spanish translations of those phrases.  Trooper Weiss prepared that sheet with the help of a friend who spoke Spanish.  Weiss believed the phrase meant, "Can I search your car?"  Leiva responded, "Yes," and nodded his head.  Weiss said, "Si?"  Leiva said, "Si."  About fifteen minutes had elapsed from the time that Weiss stopped the Hyundai until Leiva said, "Si."

Weiss then went back to the front passenger Gallego. Weiss testified that he asked Gallego for consent to search and she agreed. Gallego testified that she was not asked for consent to search.

By this time, Troopers Chapman and Marrie were on the scene, along with Illinois State Police Agents Vincent Pescitelli and John Yard. The officers searched the vehicle. They found in the glove box cases designed to hold discs such as CDs, DVDs, or video games. Inside the cases were numerous credit cards. The officers also found lists of credit card numbers with associated names, addresses, and three-digit security codes. The officers opened the trunk and found numerous new I-Pads in the original packaging, clothes, purses, and the receipts for the purchase of these items. Leiva was present outside the Hyundai throughout the search. He was not restrained until the search was completed.

Martin and Gallego testified that they were recruited by Leiva to come with him on this trip. Both spoke Spanish and English. Both testified that Leiva only spoke Spanish. The three flew from Miami, Florida, to Milwaukee, Wisconsin, on June 21, 2013. Leiva rented a car, and they spent a night in a hotel. The next morning a package came addressed to Gallego. The package contained fake credit cards and two fake driver's licenses, one for each of the two women. Each woman's picture was on

one of the fake driver's licenses.  Each fake credit card was in one of the two names that appeared on the fake driver's licenses.  For the next several days, the three of them then drove around Milwaukee, other parts of Wisconsin, and metropolitan Chicago.  The three used the fake identifications and credit cards to purchase gift cards, I-Pads and other goods.  Martin testified that Leiva took back the fake driver's licenses and credit cards after they left each store.  The three were heading south on I-55 to the St. Louis metropolitan area when they were stopped.

Leiva supervised the two women.  He told them what to buy and watched as they did so.  Leiva stored the stolen goods in the trunk.  The women were also not allowed to open the trunk without Leiva's permission.  Leiva kept the fake cards in the glove box.  When Trooper Weiss pulled the Hyundai over, Leiva instructed Gallego to get the rental agreement out of the glove box.  He also told the two women to give him the fake driver's licenses and not to say anything.

After the search was completed, Leiva and the two women were arrested and taken to Illinois State Police district headquarters in Springfield, Illinois.  Illinois State Police Lieutenant Canizares then interviewed Leiva.  Canizares is fluent in Spanish.  Canizares' parents emigrated from Cuba.  Canizares grew up in a Spanish speaking

household and took Spanish in college.  Canizares gave Leiva his <u>Miranda</u> rights in Spanish, and Leiva did not agree to speak with the officers.

Trooper Marrie had transported one of the co-defendants to the Springfield headquarters.  Trooper Marrie searched his vehicle after the co-defendant was removed from the vehicle.  During the search, he discovered cards in one of the two names on the fake driver's licenses and four to five gift cards.

At the hearing, Canizares reviewed the sheet of phrases used by Trooper Weiss.  He testified that the phrase "¿Puedo buscar su coche?," meant, "Can I search your car?"  On cross examination, Canizares testified that the Spanish verb "buscar" means to search or to find.

The Defendant called three witnesses at the hearing, Veronica Espina, Tara Poetzsher, and Maria Aguas.  Espina teaches Spanish at the University of Illinois Springfield.  Espina grew up in Chile and received her undergraduate degree in Chile.  Poetzsher was a high school language teacher certified to teach Spanish.  Aguas was the Spanish translator used by this Court and by the Federal Defender's Office.  All three testified that the phrase, "Puedo buscar su coche?" meant, "Can I look for your car?", "Can I search for your car?", "Can I locate your car?", or "Can I get your

car?" The three testified that the phrase did not mean, "Can I search your car?"

The defense admitted into evidence Espina's written analysis of the phrase "Puedo buscar su coche?". Espina stated:

> Semantic problem. This is a literal translation that results in a wrong and confusing meaning, which creates a question out of context. The question could literally mean the following:
>
> - May I get your car?
> - May I locate your car?
> - May I look for your car?

<u>Defense Exhibit 4</u>, at 3. On cross examination, the witnesses agreed that the context in which a question is asked is important in determining its meaning.

## ANALYSIS

Leiva challenges the stop and the search of the vehicle. Leiva argues that Weiss did not have probable cause or a reasonable suspicion sufficient to stop the vehicle. Leiva also argues that Weiss did not have a proper basis to search the vehicle. Leiva argues that he did not consent to the search of the vehicle. The Government challenges whether Leiva had a reasonable expectation in privacy in the vehicle sufficient to give Leiva standing to raise a Fourth Amendment challenge. The Government further

argues that Weiss had probable cause to stop the vehicle and that Leiva consented to the search.

Defendant Leiva must have had a reasonable expectation of privacy in the items seized and the area searched to raise a Fourth Amendment challenge. United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006). He has the burden of proof on this issue. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). Defendant Leiva must show that he had a subjective expectation of privacy and that the expectation must be one that society is prepared to recognize as objectively reasonable. United States v. Garcia, 897 F.2d 1413, 1418 (7th Cir. 1990).

The Seventh Circuit has held that a person who rents an automobile, such as Leiva, generally has a reasonable expectation of privacy in the rented vehicle. United States v. Walker, 237 F.3d 845, 849 (7th Cir. 2001). The Seventh Circuit has also held that in circumstances in which several persons are riding together in a vehicle, a person who provides the vehicle and drives the vehicle has a reasonable expectation of privacy in the vehicle, but passengers who do not own the vehicle do not. E.g., United States v. Price, 54 F.3d 342, 345-46 (7th Cir. 1995); Garcia, 897 F.2d at 1418. Based on these precedents, Leiva had a reasonable expectation of privacy in the vehicle and has standing to raise a Fourth Amendment

challenge to the stop and search. He rented the vehicle and allowed the other two to ride with him.

The Government argues that Leiva did not have a reasonable expectation of privacy in the automobile because he had Gallego and Martin with him in the vehicle and the three of them used the vehicle for illegal activity. The Government bases this argument on United States v. Amaral-Estrada, 509 F.3d 820, 827 (7th Cir. 2007). In Amaral-Estrada, officers were following Amaral-Estrada as he drove a Chrysler M300 automobile. Amaral-Estrada parked the car, and he and a passenger walked away from it. Officers stopped Amaral-Estrada while he was walking around. Amaral-Estrada told officers that an individual named Sosa-Verdeja lent Amaral-Estrada the car with instructions to drive the car to a specific Walgreens parking lot, leave the car there and go inside. He was told that when he returned, a bag would be in the back seat of the car. Amaral-Estrada told officers that he did not care what was in the bag or what was in the car because the bag was not his and the car was not his. The officers observed the vehicle for about an hour and then went up to the vehicle with Amaral-Estrada. A bag was in the back seat. Amaral-Estrada again denied any connection to the car or the bag. The officers used

Amaral-Estrada's key to enter the car and search it. The bag contained $254,947.00 in currency. Id. at 823.

The Seventh Circuit held that Amaral-Estrada did not have a reasonable expectation of privacy in the vehicle because he did not manifest any subjective expectation of privacy. He allowed others unknown to him to enter and exit the vehicle for the purpose of leaving and taking contraband. He also repeatedly stated that he did not care about the vehicle or the bag in the vehicle. Id. at 827.

The facts are quite different here. Leiva rented the car. He asserted control over the car by driving it for several days. He never disavowed any interest in the car or its contents. He did not allow persons unknown to him to enter and exit the vehicle to pick up and leave packages. He had two passengers, but they were known to him and were riding with his permission. Amaral-Estrada has no application to this case.

Most of the other cases cited by the Government do not involve drivers challenging automobile searches. United States v. Padilla, 508 U.S. 77, 81-82 (1993) (co-conspirator who was not in the vehicle at the time of the stop did not have a reasonable expectation of privacy in the vehicle at the time of the stop); United States v. Jacobsen, 466 U.S. 109, 111 (1984) (search of a damaged package in transit in the possession of a

shipping company); United States v. Miller, 425 U.S. 435, 436-37 (1976) (search of bank records secured by subpoena); United States v. Carlisle, 614 F.3d 750, 790 (7th Cir. 2010) (search of a backpack discarded by a person fleeing on foot from a building); United States v. Villegas, 495 F.3d 761, 767 (7th Cir. 2007) (search of a common hallway in a duplex building); United States v. Asad, 739 F.Supp.2d 1127, (C.D. Ill. 2010) (search of an unlocked desk to which several persons had access in an office). These cases do not apply.

The one other case cited by the Government supports a finding that Leiva had a reasonable expectation of privacy in his case. Johnson v. United States, 604 F.3d 1016, 1020 (7th Cir. 2010) (a person who properly borrows a vehicle has a reasonable expectation of privacy in the vehicle). Leiva had a reasonable expectation of privacy in the vehicle, and so, has standing to raise a Fourth Amendment challenge.

Defendant Leiva first challenges the validity of the stop. An officer can properly stop an automobile if the officer has probable cause to believe that the driver committed a traffic violation. United States v. Bueno, 703 F.3d 1053, 1059 (7th Cir. 2013); cert. granted and judgment vacated on other grounds sub nom. Gonzalez-Zavala v. United States, __ U.S. __, 133 S.Ct. 2830 (2013). The officer's subjective motivation is irrelevant. United

States v. Hernandez-Rivas, 348 F.3d 595, 599 (7th Cir. 2003). In this case, Trooper Weiss had probable cause to believe that the Hyundai veered off the main roadway of I-55 onto the emergency lane or shoulder. Weiss and Martin both testified that Leiva made this maneuver with the Hyundai. This maneuver violated the Illinois Vehicle Code. 625 ILCS 5/11-709.1. Therefore, Weiss had probable cause to stop the Hyundai. The stop was valid.

Leiva also challenges the validity of the search. The Government asserts that the search was valid because Leiva consented to the search. A search does not violate the Fourth Amendment if the law enforcement officers receive valid consent to the search. Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (1972). The Government must prove by a preponderance of the evidence that the officer received valid consent. United States v. Sandoval-Vasquez, 435 F.3d 739, 744 (7th Cir. 2006). The test of voluntariness is whether the assent was, "the product of an essentially free and unconstrained choice by its maker." Schneckloth, 412 U.S. at 225. The Court must look at the totality of the circumstances to determine whether consent was valid. Among the factors to be considered are,

> "(1) the person's age, intelligence, and education[;] (2) whether he was advised of his constitutional rights[;] (3) how long he

was detained before he gave his consent[;] (4) whether his consent was immediate, or was prompted by repeated requests by the authorities[;] (5) whether any physical coercion was used[;] and (6) whether the individual was in police custody when he gave his consent."

United States v. Santiago, 428 U.S. 699, 704-05 (7th Cir. 2005) (quoting United States v. Raibley, 243 F.3d 1069, 1076 (7th Cir. 2001)). The Government is not required to inform the person that he has a right to refuse consent. United States v. Drayton, 536 U.S. 194, 206 (2002).

The issue in this case is whether, based on the totality of the circumstances, Leiva understood that Weiss was asking for permission to search the Hyundai when he said "Puedo buscar su coche?" Lieutenant Canizares testified that the phrase meant, "Can I search your car?" Espina, Poetzsher, and Aguas disagreed. They all agreed that the phrase meant, "Can I look for your car?"

The disagreement turns on the meaning of the Spanish verb, "buscar." According to the Oxford Spanish Dictionary, Spanish-English/English-Spanish, "buscar" means "to look" or "to seek." According to the American Heritage Spanish Dictionary: Spanish/English, Ingles/Espanol, "buscar" means "to search (or look for), seek." United States v. DeJesus Gallardo, 2006 WL 296413, at *6 (D. Neb. February 6,

2006) (citing the two dictionary definitions).[2]  After carefully considering all the evidence, the Court finds that the verb "buscar" can mean "to search," "to look", "to look for," or "to seek."  The meaning in a particular occurrence depends on the context.[3]

Some cases have discussed the meaning of buscar in the context of requesting consent to search.  In United States v. Flores-Ocampo, the officer said, "¿Me buscar por drugas en su carro?"  Flores-Ocampo, 2005 WL 466209, at *10 (D. Kan. February 21, 2005).  In DeJesus Gallardo, the officer said, "¿Yo, yo policia yo policia buscar el carro?", which was translated in that case as, "I I police I police look the car?"[4]  DeJesus Gallardo, 2006 WL 296413, at *6.  In both cases, the Court found that the suspect understood the officer's meaning as a request to search the vehicle, and the defendants effectively consented to the search.

---

[2] The Court also reviewed several translation sites available on the Internet.  Those cites translated, "Puedo buscar su coche?" as, "Can I search your car?"; "I can search your car?"; or "Can I search for your car?"  http://www.spanishdict.com/translation, visited November 22, 2013; http://translate.google.com, visited November 22, 2013; http://translation.babylon.com/spanish/to-english/, visited November 22, 2013.  See Belleville Catering Co. v. Champaign Market Place, L.L.C., 350 F.3d 691, 693 (7th Cir. 2003) (indicating that the Court could properly review available relevant sources to resolve factual disputes, "Or counsel could have done what the court did: use the Internet.").

[3] The importance of context can be seen in Espina's translation of, "Can I search your car?"  She stated that a correct translation would be, "¿Puedo registrar su coche?" Defense Exhibit 4, at 3.  The Fifth Circuit has criticized the use of the Spanish verb "registrar" as confusing because the verb also means "to register." United States v. Banuelos-Romero, 597 F.3d 763, 769 n. 2 (5th Cir. 2010).  As in this case, context resolves the meaning of these questions.

[4] Leiva criticizes the Government for only citing persuasive authority on the use of buscar in seeking consent to search.  Neither party cited any Seventh Circuit or Central District of Illinois case on this issue.  Thus, all of the cases cited by both parties are persuasive authority.

In United States v. Mora-Morales, the officer said, "¿Puedo buscar su carro por drugas?" Mora-Morales, 807 F.Supp.2d 1017, 1020 n. 4 (D. Kan. 2011).  The court interpreter in Mora-Morales stated at the hearing that the phrase meant, "I look in your car for drugs."  The defendants testified that they thought the officer used the verb "pescar" instead of "buscar."  The verb "pescar" means to fish.  Id.  The Mora-Morales Court, however, never reached the question of whether the consent was voluntary because the Court determined that the officers did not have reasonable articulable suspicion to conduct an investigative stop.  Id., at 1023-24.

These cases point out the importance of context in evaluating the totality of the circumstances and the meaning of communications between individuals.  In Flores-Ocampo and DeJesus Gallardo, the car was near the officers and the defendant; therefore, it was clear that the officer did not need to search for or locate the car.  Rather, it was clear that the officer was asking permission to search the car.

So it is here.  Leiva understood that Weiss was asking permission to take an action with respect to the Hyundai, and in so asking used the verb that means to search or to seek.  Leiva responded without hesitation, "Yes."  He was not boggled by the question as nonsensical.  Cf. United States v. Loya, 2006 WL 2135859, at *2, *5 (D. Neb. July 26, 2006) (The

defendant answered "no," in a confused voice when the officer asked for consent to search by saying, "Would you give me escuchar?" The word "escuchar" means "listen" or "heed?"). Here, Leiva knew that Weiss was asking permission to search the Hyundai. Leiva answered in English, "Yes," and then in Spanish, "Si."

Based on the totality of the circumstances, the preponderance of the evidence shows that Leiva voluntarily consented to the search. Leiva was not in custody. Weiss had just told him that he was free to go. Leiva understood that Weiss was asking for permission to search the Hyundai and said "yes," and "si." Leiva also clearly knew how to say no to the police; he declined to waive his <u>Miranda</u> rights during a custodial interrogation after his arrest. Leiva's will was not overborne by the officers. <u>See</u> <u>Schneckloth</u>, 412 U.S. at 225. Leiva voluntarily consented to the search. The search of the Hyundai did not violate Leiva's Fourth Amendment rights.

Leiva attacks Weiss' credibility because Weiss testified that Leiva said the English word, "Yes." Leiva argues that he did not speak English and so would not have spoken the word, "Yes." Any foreign traveler in an English speaking country would quickly learn the meaning of "yes" and "no," if not before. People commonly understand rudimentary words in a

foreign language; Weiss did not speak Spanish, but understood the meaning of "si." The Court finds that Weiss was credible when he testified that Leiva used the word "yes."

Leiva argues that the cases cited by the Government are distinguishable because the investigating officers suspected drugs and because the incidents were recorded by the officers. The officers' suspicions have very little relevance to determining whether the suspect voluntarily gave consent. This distinction is not significant. The recordings provided additional information to evaluate the totality of the circumstances in the cases cited by the Government. A recording would have been helpful, but the Government does not need to provide a recording to meet its burden.[5] The evidence presented establishes by the preponderance of the evidence that Leiva consented.

Leiva finally questions whether Weiss detained him an unreasonable length of time before asking for consent to search. An officer conducting a traffic stop may reasonably detain the occupants of a vehicle long enough to conduct the stop. United States v. Muriel, 418 F.3d 720, 726 (7th Cir. 2006). Weiss detained Leiva fifteen minutes to complete the traffic stop. He then told Leiva he was free to go; Leiva started to leave. The detention

---

[5] Weiss testified that his vehicle did not have a camera. The camera had been sent back to the manufacturer to be repaired.

had then ended.  The fifteen minutes was reasonable under the circumstances.  After Leiva was free to go, Weiss asked for, and secured consent to search.  The detention was over at this time.  The limited detention to complete the traffic stop was reasonable.

WHEREFORE Defendant Pavel Leiva's Motion to Suppress Evidence (d/e 21) should be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after being served with ECF copy of this Report and Recommendation.  See 28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986); 28 U.S.C. § 636(b)(1).

ENTER:  November 26, 2013

                                                  *s/ Byron G. Cudmore*
                                          UNITED STATES MAGISTRATE JUDGE